UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
VENOLA PINKNEY,                   :
                                  :
            Plaintiff             :
                                  :
      -against-                   :     02 Civ. 1944 (LMM)
                                  :     MEMORANDUM AND ORDER
EMI MUSIC PUBLISHING, DAVID REGAN :
AND JOSEPH PUZIO AS AIDER AND     :
ABETTOR,                          :
                                  :
            Defendants.           :
                                  :
----------------------------------X

McKENNA, D.J.


     Venola Pinkney ("Pinkney" or "Plaintiff"), an African-American female over forty years of age, brings this action against EMI Music Publishing, David Regan and Joseph Puzio as aider and abettor ("Defendants") alleging race and age discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law, N.Y. Exec. Law Sec 296 et. seq., and the New York City Human Rights Law, N.Y. Admin. Code Sec. § 8-101 et seq.  Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56 dismissing Plaintiff's complaint in its entirety.  For the reasons stated below, Defendants' motion is GRANTED.

# I.  Background

## A.  Plaintiff's Employment at EMI Music Publishing

The facts of this case, taken in the light most favorable to Plaintiff, as the nonmoving party, are as follows.

Pinkney began as a temporary employee in the Corporate Finance department of EMI Music[1] in October 1996.  (Pl.'s 56.1 Stmt. ¶ 52.)  Later, Pinkney began working as a temporary employee in the Corporate Finance and Strategy Planning Group ("CFS") of EMI Music Publishing in January 1999.  (Roche Aff. ¶ 3.)  Pinkney reported to Manager of Corporate Reporting Rena Zemnovich ("Zemnovich").  (Roche Aff. ¶ 3.)

As a temporary employee, Pinkney's responsibilities consisted of assembling books of financial reports, copying, and assisting with projects as needed.  (Zemnovich Dep. 28, 114, Mar. 30, 2005.)  Pinkney performed capably and Zemnovich recommended to CFS Vice President David Regan ("Regan") and CFS Sr. Vice President Joe Puzio that Pinkney be hired full-time. (Zemnovich Dep. 29-32.)  Pinkney began working in CFS as a full-time employee on April 1, 1999.  (Pl.'s 56.1 Stmt. ¶ 52.)  As a Staff Accountant, Pinkney's duties included preparing reports of EMI financial data, coding and copying invoices, reviewing invoice reports, and communicating with EMI offices worldwide

---

[1] EMI Music and EMI Music Publishing are separate departments.

concerning their financial data. (Roche Aff. ¶ 4, Ex. A.) Although a new hire, Pinkney was given a $1,000 bonus in 1999 as a gesture of good faith. (Regan Aff. ¶ 3.)

When Pinkney became a full-time employee, there were two vacant exterior offices. (Pl.'s 56.1 Stmt. ¶ 59.) Puzio and Regan decided to give Pinkney an interior office (Pl.'s 56.1 Stmt. ¶ 62) and the exterior offices were later given to Fortunato Diana ("Diana"), a Senior Accountant who was a Certified Public Accountant (CPA), and to Joe Grant ("Grant"), a Financial Analyst who had a Masters in Business Administration (MBA) (Pl.'s 56.1 Stmt. ¶ 59; Roche Aff. ¶ 7). Microcontrol Administrator Gerard Boucher ("Boucher"), David Petruzziello (Diana's predecessor), and Zemnovich all had exterior officers and were not CPAs. (Pl.'s 56.1 Stmt. ¶ 60.)

Pinkney received Internet access several weeks after beginning as a full-time employee (Pl.'s Opp'n 3; Pinkney Dep. 204, Oct. 27, 2003) and only after she complained (Pl.'s 56.1 Stmt. ¶ 63). Diana and Grant received immediate Internet access. (Pl.'s 56.1 Stmt. ¶ 63.) Pinkney was the only employee who did not have a stereo system in her office. When she was offered a portable stereo, or "boombox," she retrieved the stereo system from her prior office at EMI Music (where she worked before joining CFS). (Pl.'s 56.1 Stmt. ¶ 31; Pinkney Dep. 150.)

EMI Music Publishing employees are eligible for "ticket buys" – where the company purchases tickets for employees to upcoming concerts by EMI artists.  Pinkney was not informed of "ticket buys" both when she was in and out of the office. (Pl.'s 56.1 Stmt. ¶ 26.)  Puzio's Administrative Assistant, Kim Fracassi ("Fracassi"), told Pinkney that Puzio restricted ticket buys to those who were actually in the office.  (Id.; Pinkney Dep. 39).  However, when other employees were out of the office, they were able to participate in ticket buys if they left instructions and/or called in their requests.  (Puzio Dep. 90, Mar. 23, 2005.)  Puzio said that he never instructed Fracassi to deny requests made from outside the office.  (Id.)

Puzio granted Diana and Zemnovich compensatory time off and granted none to Pinkney (Pl.'s 56.1 Stmt. ¶ 95) even though she frequently stayed late (Pl.'s 56.1 Stmt. ¶ 68, 95).  Pinkney complained to Zemnovich and Puzio about the lack of compensation for her long hours, and they did not take any action.  (Pl.'s 56.1 Stmt. ¶ 95.)  Pinkney claims she felt ignored and isolated within CFS.  (Pl.'s 56.1 Stmt. ¶ 72.)  Pinkney also believes she was excluded from departmental lunches. (Pl.'s 56.1 Stmt. ¶ 73.)

One occasion, Boucher referred to Pinkney as "my nigger" (Pinkney Dep. 63) in the presence of Zemnovich and Diana (although Zemnovich denies that she was aware of the incident (Zemnovich Dep. 41)).  Boucher then related an offensive story

about his "very prejudice[d]" family who had a "big brawl" with a black waitress. (Pinkney Dep. 64.) Neither Diana nor Zemnovich took any action in response to Boucher's statements. (Pl.'s 56.1 Stmt. ¶ 101.)

Pinkney claims that Zemnovich harassed her on a near daily basis. According to Pinkney, Zemnovich would yell at her, unfairly criticize her work before it was completed, demean her by assigning her "menial, clerical and janitorial tasks," and give her incorrect information and instructions and then blame her when the work was faulty. (Pl.'s 56.1 Stmt. ¶ 65.) Zemnovich often referred to Pinkney as "grandma" in a condescending manner and ignored Pinkney's protests to the usage. (Pl.'s 56.1 Stmt. ¶ 104; Pinkney Dep. 69, 71.) Zemnovich states that she was attempting to congratulate Pinkney on the birth of her grandson. (Zemnovich Dep. 46.) However, Pinkney's grandson was born in 1998, before Pinkney joined CFS (Pinkney Aff. ¶ 17), and was not a newborn when she worked with Zemnovich.

On Febrary 8, 2000, Pinkney met with Zemnovich to discuss Zemnovich's harassment and mistreatment of her. (Pl.'s Opp'n 7; Pl.'s 56.1 Stmt. ¶ 67.) Zemnovich states that they met at Puzio's suggestion so that Zemnovich could discuss problems with Pinkney's work. (Zemnovich Dep. 89-90.) Zemnovich recorded several deficiencies in Pinkney's performance (Defs.' 56.1

Stmt.89-90, 92-93): Pinkney was unable to generate off-quarter and quarterly reports for the parent company (Zemnovich Dep. 108-110); she failed to retain originals of balance sheets and profit and loss statements for reconciliation (Id. 106-108); she failed to accurately generate monthly inter-company reconciliation reports (Id. 110-112, 117); she labeled reports incorrectly, with the wrong year, month, or currency (Id. 114-115); she excessively used the telephone for personal calls or gossiped with the Chief Financial Officer's Administrative Assistant during work time (Id. 113-114, 120-121); she generated ledger reports for the wrong month (Id. 116-117); and she took time off without enough notice to arrange coverage (Id. 118-120). Pinkney states that she only used the telephone for non-urgent personal calls when there was "down time" at the office. (Pl.'s 56.1 Stmt. ¶¶ 9, 88.) Pinkney believes that Zemnovich did not like her and used these alleged performance problems as an excuse to criticize her because of her race and age. (Pl.'s 56.1 Stmt. 69.)

Pinkney requested and was granted a two-week unpaid leave of absence in March 2000 during CFS's busiest time. (Pinkney Dep. 101-102.) In April 2000, Zemnovich completed Pinkney's annual review, giving her an overall rating of 4-5 (on a scale of 1 to 5, with 5 being the lowest). (Le Roux Affirm. Ex. F.)

Pinkney complained several times to Regan about Zemnovich's

harassment and discriminatory mistreatment but Regan took no
action. (Pl.'s 56.1 Stmt. ¶ 74.) Pinkney sent an email on
February 9, 2000 to the department complaining of the disrespect
she felt in CFS, stating in relevant part:

> In as much as some of the things you brought to my
> attention lacks merit, let me reiterate that any
> mistakes made on my behalf must always be brought to
> my attention, if not, I will assume there were none.
> Let me also reiterate the level of DISRESPECT I have
> experienced and continue[] to experience is appalling.

(Pl.'s 56.1 Stmt. ¶ 70.) In response to her email, Regan
ignored Pinkney and later told Pinkney to never send such an
email again. (Pinkney Dep. 123.)

After the February 9, 2000 email, Defendants did not
explain to CFS employees what was appropriate and acceptable
workplace behavior. (Pl.'s 56.1 Stmt. ¶ 99.) Aside from
receiving manuals when hired, neither Zemnovich nor any other
EMI CFS personnel received training regarding EMI's anti-
harassment and discrimination policy (Pl.'s Opp'n 8; Puzio Dep.
77-78), and management did not conduct such a training after
Pinkney filed a complaint with the Equal Employment Opportunity
Commission ("EEOC") in July 2001.

On March 22, 2000, Pinkney and the rest of the CFS group
received an email (forwarded by Puzio) from Anne Roche
("Roche"), Director of Human Resources, with the subject "April
1st Salary Increases." The email stated in relevant part:

> Due to the fact that EMI [Music Publishing's] Budget
> will not be reviewed by EMI Group until April 4th, we
> will be unable to process the April 1st salary
> increases during the April 15th payroll. Increases
> will be reflected in the April 30th paychecks. Please
> pass this information to your staff and assure them
> that increases will be processed retroactively to
> April 1st. Tom Kelly or Joe Puzio will be forwarding
> salary increase spreadsheets to you shortly. Please
> DO NOT discuss salary increase amounts with your
> employees until you receive notification of approval
> from the Finance department.

(Le Roux Affirm. Ex. E.)

On April 28, 2000, after learning that her co-workers
received raises, Pinkney sent an email to Joe Puzio asking why
she did not receive a raise. (Pl.'s 56.1 Stmt. ¶¶ 76-77; Le
Roux Affirm., Ex. E.) On May 1, 2000, Pinkney met with Regan,
Zemnovich, and Roche who read to her from a document that
detailed criticisms of her work performance and reasons why she
did not receive a raise (Pl.'s 56.1 Stmt. ¶ 77.) After it was
read to her, Pinkney was asked to sign it, but she refused
because she disagreed with the entirety of its contents. (Pl.'s
56.1 Stmt. ¶¶ 79-80.) Defendants state that Pinkney was told
that they would meet again to assess whether she had improved
her performance. (Roche Aff. ¶ 12; Regan Aff. ¶ 11.)

In order to make extra money, since she did not receive a
raise in 2000, Pinkney took a baby-sitting position for a period
of time. Pinkney asked to leave by 6:00 pm to accommodate that
job. (Regan Aff. ¶ 9.) Pinkney was unable to continue the

baby-sitting job due to her long hours at EMI.  (Pl.'s Opp'n 9.)

On May 25, 2000, Zemnovich emailed Pinkney asking her to "tidy up the workspace outside" Pinkney's office.  (Le Roux Affirm. Ex. H.)  In response to Zemnovich's email, Pinkney sent an email to Roche on May 26, 2000, asking if Pinkney was "promoted to housekeeping."  (Le Roux Affirm. Ex. H.)  Pinkney complained to Roche on at least two occasions about Zemnovich's harassment; including that Zemnovich asked her to do degrading "maid service work" in cleaning up the area outside her office (Pl.'s 56.1 Stmt. ¶ 90), delivering work to other floors, and do photocopying and filing (Pinkney Dep. 61).  Pinkney states that Roche did nothing to address these complaints. (Pinkney Dep. 138-139.)  In July 2000, Zemnovich recommended to Puzio and Regan that Pinkney not receive a bonus because of her continued poor work performance.  (Regan Aff. ¶ 12.)

Others in the office also had a negative opinion of Zemnovich.  Diana, a Senior Accountant and his predecessor Petruzziello, both white men, and Pinkney's successor, Zaheda Ansari ("Ansari"), a South Asian woman, all complained about Zemnovich's poor treatment of them.  (Pl.'s 56.1 Stmt. ¶ 102; Puzio Dep. 105-106.)  Ansari complained about staying late unnecessarily and Zemnovich's management style.  (Pl.'s 56.1 Stmt. ¶ 102; Puzio Dep. 105-106, 116.)

Ultimately, in July 2000, Pinkney inquired about

transferring to another EMI department. (Roche Aff. ¶ 13; Pl.'s 56.1 Stmt. ¶ 107.) In her meeting with Roche, where they discussed available EMI positions, Pinkney stated she would not consider lower salaried positions and did not want to work with other departments that required contact with CFS. (Roche Aff. ¶ 13.) Roche claims that, given Pinkney's restrictions, there were no available positions to which she could be transferred. (Roche Aff. ¶ 14.) Pinkney states that she was aware of at least one other EMI position that was available outside the department, but Pinkney claims that Roche did not assist her and the position was ultimately filled by a white employee. (Pl.'s 56.1 Stmt. ¶ 107.) According to Pinkney, Roche told her that she was not suited to any other position at EMI due to her age and that EMI preferred younger people for certain positions. (Id. ¶ 108.) Roche denied those allegations in her supplemental affidavit. (Roche Suppl. Aff. ¶ 3.)

In late August 2000, Puzio and Roche met with Pinkney and informed her of their decision to terminate her employment. (Pl.'s 56.1 Stmt. ¶ 112.)

### B. Procedural Background

On July 2, 2001, Plaintiff filed race and age discrimination claims with the EEOC. After the EEOC determined it was unable to resolve Plaintiff's claims, it issued a 90-day right to sue letter on December 11, 2001. Thereafter, Plaintiff

filed the instant lawsuit on March 8, 2002.  Defendants now move
for summary judgment on all claims.

## II.  Discussion

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that the
moving party is entitled to summary judgment "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  "A dispute is not 'genuine' unless 'the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party.'"  Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45
(2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986)).  "A fact is 'material' for these purposes
if it 'might affect the outcome of the suit under the governing
law.'"  Overton v. N.Y. State Div. of Military & Naval Affairs,
373 F.3d 83, 89 (2d Cir. 2004) (quoting Anderson, 477 U.S. at
248).  On a motion for summary judgment, a court is to view the
record in the light most favorable to the nonmoving party and
resolve all ambiguities and draw all reasonable inferences
against the moving party.  Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986).  "[T]he mere existence of
some alleged factual dispute . . . will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-248. See also Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987).

In employment discrimination, it is rare to find direct evidence establishing an employer's intentional discrimination. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir. 1989) ("[T]he court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file.'" (quoting Thornbrough v. Columbus & Greenville R. Co., 760 F.2d 633, 638 (5th Cir. 1985))); Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) (In "reality . . . direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier."). In reviewing motions for summary judgment, a trial court must be cautious when an employer's intent is at issue. See Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). While trial courts must be cautious, summary judgment is not precluded in the employment context. See Taylor v. Polygram Records, No. 94 Civ. 7689, 1999 WL 124456, at *7 (S.D.N.Y. 1999); Chambers,

43 F.3d at 40; <u>Meiri</u>, 759 F.2d at 998; <u>Abdu-Brisson v. Delta Air Lines Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.")

**B.   Discrimination Claims**

All claims are governed by the <u>McDonnell Douglas</u> burden shifting analysis. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (applying <u>McDonnell Douglas</u> to employment discrimination claims under Title VII, New York Executive Law § 296, and the New York City Administrative Code); <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997) (applying <u>McDonnell Douglas</u> to Section 1981 claims); <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005) (applying <u>McDonnell Douglas</u> to ADEA claims).

The <u>McDonnell Douglas</u> three stage analysis begins with the burden on the plaintiff. The plaintiff must prove, by a preponderance of the evidence, a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-253 (1981). The plaintiff must prove that at the time she was discharged: (1) she was a member of the protected class; (2) she was otherwise qualified for the position; (3) she suffered an adverse employment action; (4) and that action occurred in circumstances

giving rise to an inference of discrimination.  <u>Williams v. R.H.</u>
<u>Donnelley, Corp.</u>, 368 F.3d 123, 126 (2d Cir. 2004); <u>Chambers</u>, 43
F.3d at 37.  In assessing a motion for summary judgment, the
plaintiff's burden of proof  "at the prima facie stage is de
minim[i]s."  <u>Dister</u>, 859 F.2d at 1114 (affirming summary
judgment, but rejecting district court's rationale that a prima
facie case had not been established).

If the prima facie case is established, the burden then
shifts to the defendant who must produce evidence of a
legitimate, nondiscriminatory reason for its actions.  <u>McDonnell</u>
<u>Douglas</u>, 411 U.S. at 802-804; <u>Burdine</u>, 450 U.S. at 254
(defendant must "produc[e] evidence that the plaintiff was
rejected, or someone else was preferred, for a legitimate,
nondiscriminatory reason").  It is a burden of production, not
persuasion.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509
(1993) (the burden "can involve no credibility assessment"); <u>see</u>
<u>also</u> <u>Burdine</u>, 450 U.S. at 254-256; <u>Dister</u>, 859 F.2d at 1115
(defendant "is required to articulate - but not prove - a
legitimate, nondiscriminatory reason").

Finally, because "[t]he ultimate burden of persuading the
trier of fact . . . remains at all times with the plaintiff," if
the defense meets its burden of production, the burden shifts
back to the plaintiff, who must prove by a preponderance of the
evidence that defendant's proffered reason is a pretext.

Burdine, 450 U.S. at 253.  "It is not enough . . . to dis

believe [sic] the employer; the factfinder must believe the

plaintiff's explanation of intentional discrimination."  Hicks,

509 U.S. at 519.

> The factfinder's disbelief of the reasons put forward
> by the defendant (particularly if disbelief is
> accompanied by a suspicion of mendacity) may, together
> with the elements of the prima facie case, suffice to
> show intentional discrimination.  Thus, rejection of
> the defendant's proffered reasons will permit the
> trier of fact to infer the ultimate fact of
> intentional discrimination.

Id. at 511.

### 1.    Title VII Claim of Race Discrimination

Title VII provides that it is unlawful for an employer "to

discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment,

because of the individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a)(1).  As discussed,

Plaintiff's Title VII claim is governed by the McDonnell Douglas

burden-shifting analysis.

### a.    Prima Facie Case

Plaintiff has established the first three elements of her

prima facie case by showing: (1) that she is an African-American

and thus, a member of the protected class; (2) that she has more

than 20 years of experience and thus, is qualified for the

position; and (3) that her discharge was an adverse employment

action.[2]  Whether Pinkney has established the fourth element,

that her discharge occurred in circumstances giving rise to an

inference of race discrimination, is less clear.

Courts use varied methods to determine whether there is an

inference of discrimination in employment cases.  Chambers, 43

F.3d at 37-38.  "[T]here is no unbending or rigid rule about

what circumstances allow an inference of discrimination. . . .

[T]he fourth element set forth in McDonnell Douglas is a flexible

one that can be satisfied differently in differing factual

scenarios."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81,

91 (2d Cir. 1996); see also Chambers, 43 F.3d at 37-38 (citing

as examples of circumstances where a court infers discrimination

the following: employer continuing to seek applicants with

similar qualifications after discharging plaintiff; employer

criticizing plaintiff's performance in ethnically degrading

terms; employer making invidious comments about others in the

employee's protected group; employer favorably treating

---

[2]     Although Pinkney alleges several adverse employment actions (e.g., no
bonus or raise in 2000, no exterior office, no compensatory time, etc.), her
employment termination is sufficient for this element of the prima facie
case.  An adverse employment action is a "materially adverse change" in the
terms and conditions of employment.  Richardson v. N.Y. State Dep't of Corr.
Serv., 180 F.3d 426, 446 (2d Cir. 1999).  Examples include "termination of
employment, a demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits, significantly diminished
material responsibilities, or other indices . . . unique to a particular
situation."  Galabya v. N.Y. City Bd. of Educ., 202 F. 3d 636, 640 (2d Cir.
2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136
(7th Cir. 1993)).

employees not in the protected group).

One way to show this inference is for the plaintiff to prove "that similarly situated employees of a different race were treated more favorably." <u>Norville v. Staten Island Univ. Hosp.</u>, 196 F.3d 89, 95 (2d Cir. 1999); <u>see also</u> <u>Shumway v. UPS</u>, 118 F.3d 60, 63 (2d Cir. 1997). As here, "cases occasionally arise where a plaintiff cannot show disparate treatment only because there are no employees similarly situated to the plaintiff." <u>Abdu-Brisson</u>, 239 F.3d at 467. Pinkney argues that she was "denied the same benefits enjoyed by her . . . Caucasian colleagues." (Pl.'s Opp'n 15.) However, because she was the only African-American and the only Staff Accountant within CFS, the disparate treatment analysis is unavailable to her.

Aside from the disparate treatment argument, Plaintiff alleges that co-worker Boucher called her "my nigger" in Zemnovich and Diana's presence.[3] During her deposition, Pinkney said Boucher used the phrase as if to say "you're my friend." (Pinkney Dep. 65-66.) Despite this, "the word 'nigger' is pure anathema to African-Americans . . . [Courts] recognize that the word 'nigger' can have a highly disturbing impact on the listener." <u>McKay v. Principi</u>, No. 03 Civ. 1605, 2004 WL 2480455, at *6 (S.D.N.Y. 2004). At the same time, Boucher had

---

[3] Although Zemnovich denies she made this remark, this Court must view the facts in the light most favorable to plaintiff.

no managerial authority over Pinkney and "[e]mployers are not .

. . . vicariously liable for a hostile work environment created by

a mere co-worker of the victim."  <u>Mack v. Otis Elevator Co.</u>, 326

F.3d 116, 123 (2d Cir. 2003).  Further, Boucher's remarks,

without more, cannot facilitate an inference of discrimination

since he played no role in Pinkney's hiring or dismissal.  <u>See,</u>

<u>e.g.</u>, <u>Khan v. Abercrombie & Fitch, Inc.</u>, No. 01 Civ. 6163, 2003

WL 22149527, at *7 (S.D.N.Y. 2003) ("[Employee] played no role

in [defendant's] decision to terminate [plaintiff] . . . and

therefore his statements, even if uttered, do not raise an

inference of discrimination.").[4]  After getting no apparent

response from Zemnovich during or after the exchange, Pinkney

never explicitly discussed the incident with Regan[5] or Roche.  It

is arguable that Pinkney implicitly referred to the incident in

the email she sent to CFS on February 9, 2000, regarding the

"disrespect" she suffered in the department.  Pinkney states

that this email was in response to the Boucher and other

incidents.  Pinkney further states that, in response to her

---

[4]    <u>But cf.</u> <u>Malarkey v. Texaco, Inc.</u>, 983 F.2d 1204, 1210 (2d Cir. 1993)
(holding that statements made by non-decisionmakers were properly received
into evidence "because they showed the pervasive corporate hostility towards
[plaintiff] and supported her claim that she did not receive a promotion due
to her employer's retaliatory animus").  Pinkney does not allege that
Zemnovich, Regan, or Puzio made any remarks reflecting racial animus or a
pervasive workplace hostility.
[5]    Regan claims that "he is particularly sensitive to any such remarks
because his wife is [African-American] and his children are biracial."
(Defs.' Mem. n.9.)

email, Regan told her never to send such a memo again.

Additionally, Plaintiff may also show that her discharge occurred in circumstances giving rise to an inference of discrimination by illustrating that there was "more favorable treatment of employees not in the protected group." Abdu-Brisson, 239 F.3d at 468 (citing Chambers, 43 F.3d at 37). For example, Pinkney was not always notified of ticket buys, while all her co-workers seemed to be aware of them; also, unlike Diana and Grant, who received Internet access immediately, Pinkney only received Internet access after she complained; and Pinkney did not receive compensatory time, as Diana and Zemnovich did, even though she worked long hours. Further, Pinkney alleges that she was assigned "menial, clerical and janitorial tasks" that were not in her job description. (Pl.'s Opp'n 18.) Plaintiff uses as an example the incident in which Zemnovich emailed Pinkney to "tidy up" the area outside Pinkney's office. Pinkney had previously seen Fracassi, who is an Administrative Assistant, do such a task. (Pinkney Dep. 61.)

Plaintiff has sufficiently alleged that others in CFS were more favorably treated than she was, that she was assigned tasks previously assigned to someone in a lower position, and that, given her co-worker's discriminatory comment and management's lack of response, she may have felt it was a hostile work environment. Therefore, Plaintiff has met her minimal burden

and established a prima facie case of race discrimination.

**b.    Defendants' legitimate, nondiscriminatory reasons for adverse employment actions against Plaintiff**

Defendants meet their burden of producing evidence that Plaintiff was discharged (and suffered other adverse employment actions) for nondiscriminatory reasons.  Defendants argue that Pinkney's "junior staffing level or other business considerations" were the reasons for Plaintiff's perceived discrimination.  (Defs.' Mem. of Law 10.)

**(1)    Annual performance review**

Pinkney argued that she was the only CFS employee to receive an annual performance review.  Pinkney was not the only employee to receive such a review by Zemnovich.  Zemnovich's other direct report, Diana, also received an annual performance review.  (Defs.' 56.1 Stmt. ¶ 11.)

In addition to the review, Zemnovich kept records of Plaintiff's numerous errors.  (Id. ¶ 7.)  It was because of that overall poor performance that Pinkney was not given a bonus or raise in 2000.

**(2)    Co-worker's racial comment**

As discussed, Plaintiff's co-worker Gerard Boucher referred to Pinkney as "my nigger."  Defendants claim that they were not aware of this incident and Zemnovich claims she was not present.  Even assuming that the incident happened as Pinkney alleges, as

the Court must, Defendants cannot be held vicariously liable for remarks by a co-worker, especially given that no one in management ever made any remarks reflecting racial animus. Mack, 326 F.3d at 123. Further, Pinkney acknowledges that Boucher's comment, although inappropriate, was intended in a friendly manner and not intended to convey hostility.

### (3)  Access to "ticket buys"

Pinkney claims that she was unable to participate in some "ticket buys"; in particular, when she was out of the office. According to Puzio, the informal policy was that if an employee was not in the office, she generally did not have an opportunity to participate unless she called in or left instructions. (Puzio Dep. 90.)  In addition, Pinkney was not the only one to miss these so-called "ticket buys."  Zemnovich, who is white (and under forty years of age), missed "ticket buys" as well. (Defs.' 56.1 Stmt. ¶ 27.)

### (4)  Allocation of offices, stereo, and Internet

Pinkney alleges that she was given an interior office instead of an exterior office because of her race.  Defendants state that exterior offices were assigned to or designated for employees at a more senior level.[6]  Pinkney's successors received

---

[6]     Defendants state that David Petruzziello and Gerard Boucher were assigned exterior offices because they held senior positions.  (Roche Aff. ¶7, Ex. B; Le Roux Affirm. Ex. E.)

the same interior office that Pinkney had.  One such successor was later promoted and, accordingly, received an exterior office.  (Roche Aff. ¶ 10.)

Defendants state they classified stereos as luxury items that were not required for work.  Puzio does not recall specifically why Pinkney was not offered a stereo but said it may have been related to budget constraints at that time or because Pinkney held a junior staff position "that didn't warrant a stereo."  (Puzio Dep. 59-60.)  Ultimately, Pinkney retrieved a stereo from her prior office (in another division of EMI).  Pinkney's successor also received a portable stereo.

Pinkney did not receive Internet access immediately. Defendants argue that because Internet access was not required for Pinkney's position, a claim that Pinkney confirmed (Pinkney Dep. 203), the delay in access is not significant.

### (5)  **Work assignments**

Pinkney alleges that she was assigned certain tasks such as making copies, filing, purging old files, and hand-delivering internal documents.  Defendants state that Pinkney was assigned that work due to junior staff level.

Pinkney relates one such incident where she was asked to "tidy up" the area outside her office.  When she refused, Zemnovich, who is white (and under forty years of age) organized the area herself.  (Defs.' 56.1 Stmt. ¶ 39.)  No disciplinary

action was taken against Pinkney for her refusal to complete the task.

### (6) No compensatory time

Defendants state that EMI does not have a formal compensatory time policy and that Pinkney did not receive compensatory time because she did not work as many extra hours as the employees who did receive compensatory time.[7]  (Regan Aff. ¶ 9; Puzio Suppl. Aff. ¶¶ 4-5; Puzio Dep. 103-105.)  Although Pinkney claims that she worked long hours, her two week unpaid leave for surgery during CFS's busiest time (March 2000) explains why her hours for the year may have been lower than others' hours.

### (7) Exclusion from lunches

Pinkney alleges that she was excluded from departmental lunches.  Defendants state that the rest of the group had individual lunch plans.  There was only one lunch that Pinkney was not invited to and that was David Regan's anniversary lunch. And Pinkney was not the only CFS employee who was not invited to that lunch; only Regan's direct reports and other EMI executives attended.  (Defs.' 56.1 Stmt. ¶ 38.)

Therefore, Defendants have offered legitimate, nondiscriminatory reasons for each adverse employment action

---

[7]     The employees who received comp time were Rena Zemnovich and Fortunato Diana.

allegedly suffered by Plaintiff.  Because these are satisfactory

reasons, the burden shifts to plaintiff to prove these reasons

are a pretext for discrimination.  <u>Burdine</u>, 450 U.S. at 253.

### c.  Plaintiff's pretext argument

Plaintiff's "evidence must show circumstances that would be

sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based

in whole or in part on discrimination." <u>Stern v. Trustees of</u>

<u>Columbia Univ.</u>, 131 F.3d 305, 312 (2d Cir. 1997).  Plaintiff is

unable to prove that Defendants' explanations are merely

pretext.

As discussed, Pinkney's case is a difficult one because

there were no similarly situated individuals in CFS.  During her

time there, Pinkney was the only African-American (and racial

minority) and the only Staff Accountant within the group.

Pinkney offered testimony about African-American employees from

other departments who were treated differently than non-minority

employees.  (Pinkney Dep. 78-79.)  One example involved a

comparison between a black chauffeur in another department who

was fired when he abused a company credit card compared to Kim

Fracassi, Puzio's assistant, who is white and was not fired when

she allegedly sold tickets she received through a "ticket buy."

(Pinkney Dep. 78-80, 185-86.)  Apart from Fracassi's denial

(Puzio Dep. 13-14), Fracassi and the chauffeur are not similarly

situated in "all material respects," <u>Shumway</u>, 118 F.3d at 64,
particularly because misusing a company credit card is very
different than reselling tickets.  Therefore, this example is
immaterial to Plaintiff's pretext argument.

Defendants state that Pinkney's poor work performance was
the reason she was denied a salary increase and a bonus in 2000
and why she was ultimately discharged.  In addressing
Defendants' claims, Pinkney states that she would often receive
incorrect information from Zemnovich that would affect her
results.  Further, Pinkney claims that Zemnovich would often
open her work (via the office intranet) before it was completed
and correct it without telling Pinkney.  These arguments do not
address each work performance issue that Zemnovich chronicled.
Specifically, incorrect directions do not address Pinkney's
inability to compile certain regularly required reports (e.g.,
the off-quarter and quarterly reports) – reports that require
the same steps, but at different times of the year.  (Zemnovich
Dep. 111-112.)  Even if Pinkney's inability to complete these
reports can be linked to incorrect instruction, "'an employee's
disagreement with the employer's perceptions of his job
performance does not satisfy his burden of showing that the
employer's proffered justification was a pretext for
discrimination.'"  <u>Brown v. Time, Inc.</u>, No. 95 Civ. 10081, 1997
WL 231143, at *12 (S.D.N.Y. 1997) (quoting <u>Arnell v. Pan Am</u>,

1986 WL 11455, at *5 (S.D.N.Y. 1986)).  "Such speculation, without more, is insufficient to support [plaintiff's] claim."  Arnell, 1986 WL 11455, at *5.

Additionally, there is no other evidence, direct or circumstantial,[8] that shows Zemnovich's actions were racially motivated.  Pinkney was not alone in her difficulties with Zemnovich.  Pinkney's successor, Zaheda Ansari, who is South Asian, resigned from EMI because of her inability to work with Zemnovich.  (Puzio Dep. 106.)  Fortunato Diana, a white male, continuously complained to Regan about problems he was having with Zemnovich.  (Regan Aff. ¶ 22.)  Also, Diana's predecessor, David Petruzziello, a white male, also had problems with Zemnovich.  (Puzio Dep. 107.)  At best, this evidence shows that Zemnovich was a bad manager.  After Zemnovich's dismissal,[9] Defendants did not revisit Pinkney's discharge because Zemnovich chronicled Pinkney's errors so thoroughly.  (Puzio Dep. 230-231.)

The "same actor inference" further detracts from Pinkney's argument that Defendants' reasons are mere pretext.  "[W]hen the

---

[8]    Assuming that Zemnovich was present during the Boucher's "my nigger" comment, as the Court must, that incident is insufficient to cast a shadow of racial animus on Zemnovich since, as discussed, employers cannot be held vicariously liable for remarks by co-workers who are not in a supervisory position in respect to plaintiff.  Mack, 326 F.3d at 123.

[9]    Zemnovich was terminated because she was "disruptive" to CFS.  (Puzio Dep. 105-106) ("Rena was terminated because she had become disruptive to the group . . . We had several instances . . . [where] employees complain[ed] about her treatment of them.")

person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997); see also Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000); Wolde-Meskel v. Argus Cmty., No. 99 Civ. 10112, 2001 WL 883648, *6 (S.D.N.Y. 2001). Although Plaintiff argues that the same actor inference is "available and strongest when only a short period of time has passed between the two decisions" (Pl.'s Opp'n 21 (citing Grady, 130 F.3d at 560 (applying same actor inference when nine days passed between plaintiff's hiring and firing))), Grady does not preclude applying the same actor inference in general. In fact, the same actor inference was applied when three years passed between hiring and firing of a plaintiff. Schnabel, 232 F.3d at 91. It is clear that Pinkney's hire and discharge sixteen months later were based on Zemnovich's recommendations to Regan and Puzio. (Puzio Dep. 233.)

Therefore, because Plaintiff has not proven that Defendants' legitimate, nondiscriminatory reasons for her discharge were a pretext, Defendants' motion for summary judgment on the Title VII claim is GRANTED.

### 2. Age Discrimination in Employment Act (ADEA) Claim

The ADEA provides that it is unlawful for an employer "to

discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. § 623(a)(1). The Act protects persons forty years of age or older. 29 U.S.C.A § 631(a). As discussed, Plaintiff's ADEA claim is governed by the McDonnell Douglas burden-shifting analysis.

### a. Prima Facie Case

Plaintiff has established the first three elements of her prima facie case by showing: (1) that she is over forty years of age and thus, a member of the protected class; (2) that she has more than 20 years of experience and thus, is qualified for the position; and (3) that her discharge was an adverse employment action.[10] Whether Pinkney has established the fourth element, that her termination occurred in circumstances giving rise to an inference of age discrimination, requires further discussion.

Pinkney was replaced by a younger person; but case law conflicts as to whether replacement by a younger person is sufficient to meet the "minimal" burden of the prima facie case. See Mastrangelo v. Kidder, Peabody & Co., Inc., 722 F. Supp. 1126, 1133 (S.D.N.Y. 1989) (finding replacement by a younger person sufficient to establish a prima facie case of age

---

[10]     See supra n.2.

discrimination); but cf. O'Sullivan v. N.Y. Times, 37 F. Supp.
2d 307, 319 (S.D.N.Y. 1999) ("[A]llegations of replacement by
younger workers do not, without more, prove discrimination.");
Coleman v. Prudential Relocation, 975 F. Supp. 234, 242 (W.D.N.Y.
1997) (finding replacement by a younger employee "might establish
the fourth element of plaintiff's prima facie case, but
establishing the 'minimal requirements' of a prima facie
discrimination case does not necessarily mean that the
plaintiff's case is strong enough to withstand summary
judgment").

Given that the more recent cases, O'Sullivan and Coleman,
require additional allegations, the Court will examine other
factors that could give rise to an inference of age
discrimination.  Pinkney claims that Zemnovich referred to her
as "grandma."  (Pinkney Dep. 149.)  While Zemnovich claims she
was only congratulating Pinkney on the birth of her grandson,
Pinkney's grandson was born in 1998 and was not a newborn when
Pinkney worked in CFS.  Also, Pinkney claims that when she spoke
with Roche (in Human Resources) about transferring to another
EMI department, Roche told her that EMI looks for younger people
for certain positions.  Although Roche denies stating this
(Suppl. Aff. ¶ 3), under a summary judgment analysis, Pinkney's
version must prevail.  Therefore, these remarks in addition to
Pinkney's replacement by a younger employee lead to an inference

of age discrimination.  The Second Circuit has held that "when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.'" Abdu-Brisson, 239 F.3d at 468 (quoting Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998)); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) ("[S]tray comment may bear a more ominous significance when considered within the totality of all the evidence.") (citation and quotations omitted).

Although others, who were under age forty,[11] complained about Zemnovich, Roche's alleged statement helps bolster an inference of age discrimination.  Therefore, the remarks by Zemnovich and Roche and the fact that Pinkney's successor was younger are enough to meet Plaintiff's minimal burden and establish an inference of age discrimination.

   **b.  Defendants' legitimate, nondiscriminatory reasons for adverse employment action against Plaintiff**

Based on the analysis of Pinkney's race discrimination claim, Defendants have met their burden of production and have stated legitimate, nondiscriminatory reasons for discharging Pinkney.  Defendants produced evidence showing that Plaintiff's

---

[11]     e.g., Zaheda Ansari and Fortunato Diana.

poor work performance, junior staffing level, and CFS's business
considerations were the reasons for Plaintiff's perceived
discrimination.  Defendants produced evidence showing that
Pinkney was not singled out because of her race or age, and that
others in CFS had similar experiences.

### c.   Plaintiff's pretext argument

As discussed, once Defendants produce sufficient evidence
to support a nondiscriminatory explanation for the discharge of
plaintiff, plaintiff "must be afforded the 'opportunity to prove
by a preponderance of the evidence that the legitimate reasons
offered by the defendant were not its true reasons, but were a
pretext for discrimination.'"  Reeves v. Sanderson Plumbing
Products, Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450
U.S. at 253).  Although Plaintiff has established a prima facie
case of age discrimination, Plaintiff has not proven that
Defendants' explanations were mere pretext.  Pinkney bases her
age discrimination claim, in part, on the same workplace
incidents as her race discrimination claim.  (Pl.'s Opp'n  22.)
Pinkney argues that her interior office assignment, exclusion
from department lunches and ticket buys, and Zemnovich's request
that Pinkney "tidy up" all evidence age discrimination.  At the
same time, Pinkney's successors, both younger than her, received
interior offices.  Duane King, an African-American male,
Ansari's successor, was later promoted and received an exterior

office accordingly.  As to Plaintiff's exclusion from Regan's anniversary lunch, only Regan's direct reports and other executives were invited; Diana and Fracassi, both under forty, did not attend either.  (Defs.' 56.1 Stmt. ¶ 38.)  And last, Zemnovich, who is under age forty, cleaned up the area outside of Pinkney's office and also missed ticket buys.

In addition, and perhaps more important, Pinkney was already over forty when she was hired.  Boyle v. McCann-Erickson, Inc., 949 F. Supp. 1095, 1104 (S.D.N.Y. 1997) ("Plaintiff was hired at the age of 46, a fact which undercuts an inference of age discrimination.") (internal citation omitted).  Also, Pinkney was not the only individual over forty years of age hired to work in CFS; Regan and Puzio were also both over forty.

As with the race claim, the "same actor inference" holds weight in age discrimination cases.  See, e.g., Emanuel v. Oliver, Wyman Co., 85 F. Supp. 2d 321, 334 (S.D.N.Y. 2000) ("[N]o reasonable juror could conclude that [defendant] fired [plaintiff] because he was a mere eleven months older than when he was hired."); Coleman, 975 F. Supp. at 241 (finding no age discrimination when plaintiff was hired at age fifty-one and discharged fourteen months later.).  Pinkney was fired sixteen months after becoming a full-time employee, and nineteen months after starting in CFS as a temporary employee.

Last, in terms of the alleged remarks by both Zemnovich (i.e., "grandma") and Roche (i.e., EMI wanting younger individuals for certain positions) – those remarks alone are insufficient to establish that Defendants were motivated by a discriminatory intent.  While it is significant that the remarks were made by those in a supervisory position in respect to Pinkney (i.e., direct supervisor and director of human resources), there is insufficient evidence for a reasonable jury to find that Defendants terminated Plaintiff's employment on the basis of age.  As discussed, a stray comment may "'bear a more ominous significance' when considered within the totality of the evidence," Carlton, 202 F.3d at 136 (quoting Danzer, 151 F.3d at 56), and the totality of the evidence reveals that Plaintiff's perceived persistent work product deficiencies led to her dismissal and not any discriminatory animus on Defendants' part.

Therefore, because Plaintiff has not proven that Defendants' legitimate, nondiscriminatory reasons for her discharge were pretext, Defendants' motion for summary judgment on the ADEA claim is GRANTED.

### 3.    Section 1981, New York State Executive Law, and Administrative Code of the City of New York Claims

As discussed, Section 1981, the New York State Executive Law, and the New York City Administrative Code claims are governed by the same burdens of proof and order of presentation

as Title VII and ADEA claims.  James-Gray v. Hanes Hosiery, Inc. et al., No. 95 Civ. 9950, 1998 WL 525819, *14 (S.D.N.Y. 1998); Shane v. Tokai Bank Ltd., Nos. 96 Civ. 5167 and 96 Civ. 8351, 1997 WL 639255, at *1 & n.3 (S.D.N.Y. 1997).  Therefore, for the reasons set forth above, Defendants' motion for summary judgment is GRANTED with respect to the claims under Section 1981, the New York State Executive Law, and the New York City Administrative Code.

## III. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED on all counts and Plaintiff's Complaint is dismissed.  The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff dismissing the complaint.


SO ORDERED.

Dated: August 22, 2006

Lawrence M. McKenna
U.S.D.J.